FILED

09/22/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0363

DA 19-0363

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 238

MTSUN, LLC,

        Applicant, Petitioner,
        and Appellee,

   v.

THE MONTANA DEPARTMENT OF PUBLIC
SERVICE REGULATION, MONTANA
PUBLIC SERVICE COMMISSION,

        Respondent and Cross-Appellant,

   and

NORTHWESTERN CORPORATION, d/b/a
NORTHWESTERN ENERGY,

        Intervenor, Respondent,
        and Appellant,

   and

THE MONTANA CONSUMER COUNSEL,

        Intervenor.

APPEAL FROM:    District Court of the Eighth Judicial District,
                  In and For the County of Cascade, Cause No. BDV-17-0776
                  Honorable James A. Manley, Presiding Judge

COUNSEL OF RECORD:

        For Appellant NorthWestern Energy:

        Ann B. Hill, NorthWestern Energy, Helena, Montana

For Cross-Appellant Montana Public Service Commission:

    Zachary Taylor Rogala, Luke Casey, Justin Wade Kraske, Montana Public Service Commission, Helena, Montana

For Appellee MTSUN, LLC:

    Michael J. Uda, Christine McMurry, Uda Law Firm, PC, Helena, Montana

For Intervenor Montana Consumer Counsel:

    Jason T. Brown, Montana Consumer Counsel, Helena, Montana

Submitted on Briefs:  January 15, 2020

Decided:  September 22, 2020

Filed:

_____
                   Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 The Montana Public Service Commission ("PSC") and NorthWestern Energy ("NorthWestern") appeal an order of the Eighth Judicial District Court, Cascade County, reversing and remanding the PSC's order setting terms and conditions of MTSUN, LLC's ("MTSUN") proposed 80 megawatt ("MW") solar project near Billings, Montana.

¶2 We restate the following issues on appeal as dispositive and do not address other issues raised:

> *Issue One: Whether the District Court erred in determining that the PSC arbitrarily and unlawfully found that MTSUN did not establish a legally-enforceable obligation under PURPA and therefore was not entitled to agreed-upon contract terms.*
>
> *Issue Two: Whether the PSC exceeded its authority in upending the parties' agreed-upon contract terms established by MTSUN's legally-enforceable obligation.*
>
> *Issue Three: Whether the District Court erred when it concluded that the PSC arbitrarily and unreasonably calculated MTSUN's capacity contribution in determining avoided costs.*

¶3 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Before addressing the merits of the case, we contextualize the issues presented by providing necessary background information on the governing laws, practices of the PSC, and the relevant factual and procedural history of the present action. Regarding the background of applicable federal and state law, as well as the historical practices of the PSC, we incorporate by reference this Court's discussion in *Vote Solar v. Mont. Dept. of Pub. Serv. Regulation*, 2020 MT 213, ¶¶ 4-17, 401 Mont. 85, ___ P.3d ___.

3

PURPA Background

¶5      In addition to the Public Utility Regulatory Policies Act ("PURPA") background provided in *Vote Solar*, ¶¶ 3-17, it is necessary to discuss another component of PURPA that was not at issue in *Vote Solar* but is in this case.    PURPA and Montana's implementation of PURPA requires that for larger qualifying facilities ("QFs")—those between three and 80 MWs—avoided-cost purchase prices be established between the QF and the purchasing public utility through a negotiated contract, on an "as available" basis, or pursuant to a "legally-enforceable obligation" ("LEO"), whereas smaller QFs—less than 3 MWs—receive a standard avoided-cost rate that is set by the PSC itself every two years. 16 U.S.C. § 824a-3(a), (m)(6); § 69-3-601(3)(c), MCA; 18 C.F.R. § 292.304(c), (d); Admin. R. M. 38.5.1902(5), 38.5.1909.    This dispute is centered on PURPA's legally-enforceable obligation component.

*PURPA's Legally-Enforceable Obligation*

¶6      Under its PURPA authority, *see* 16 U.S.C. § 824a-3(a), the Federal Energy Regulatory Commission ("FERC") has established that a QF can sell power to a utility via a LEO, rather than under a contract.  18 C.F.R. § 292.304(d)(2); *see Midwest Renewable Energy Projects, LLC*, 116 FERC ¶ 61017, 61073 (July 7, 2006) (holding "[t]hat Congress used the term 'contract or obligation' in drafting section 210(m)(6) [16 U.S.C. § 824a-3(m)(6)] suggests that Congress intended that the Commission continue to protect both contracts and obligations that had not yet ripened into contracts but were 'in effect or pending approval'").  A LEO is a "non-contractual, but binding" commitment from a QF to sell power to a utility.  *Cedar Creek Wind, LLC*, 137 FERC ¶ 61006, 61023 (Oct. 4,

4

2011). The phrase is used to prevent an electric utility from avoiding its PURPA obligations by refusing to sign a contract, or "from delaying the signing of a contract, so that a later and lower avoided cost is applicable." *Cedar Creek Wind*, 137 FERC at 61024. Accordingly, the establishment of a LEO turns on "the QF's commitment, and *not* the utility's actions," and when a QF commits itself to sell to an electric utility, it "also commits the electric utility to buy from the QF."[1] *FLS Energy, Inc.*, 157 FERC ¶ 61211, 61730-31, (Dec. 15, 2016) (emphasis in original). Importantly, the date that a LEO is formed is the date that the QF has the right to have its avoided-cost rate determined. 18 C.F.R. § 292.304(d)(2)(ii).

¶7    The primary legal issue surrounding the LEO provision of PURPA is whether and when a QF has committed itself to sell to an electric utility. Relevant here, FERC provides that a QF commits itself to sell electricity to a utility through either a signed contract or when the QF petitions a state utility commission because "the electric utility refuses to sign a contract" or "delay[s] the signing of a contract." *Cedar Creek Wind,* 137 FERC at 61024; *JD Wind 1, LLC*, 129 FERC ¶ 61148, 61633 (Nov. 19, 2009); New PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities, 71 Fed. Reg. 64342, 64345, 64368 (Nov. 1, 2006) (hereinafter New PURPA Section 210(m) Regulations), *aff'd sub nom.*, *Am. Forest and Paper Ass'n v. FERC*, 550 F.3d 1179, 384

---

[1] While the establishment of a LEO turns on the QF's actions and such commitment also commits the utility to buy electricity from the QF, the utility has the option of petitioning FERC under 18 C.F.R. § 292.310 for relief from its mandatory purchase obligation.

U.S. App. D.C. 73 (D.C. Cir. 2008).[2]  Upon petitioning, "a non-contractual, but still legally-enforceable obligation will be created pursuant to the state's implementation of PURPA." *JD Wind 1*, 129 FERC at 61633.

The Proposed Energy Project

¶8     The proposed energy project at issue in this case is MTSUN's 80 MW single-axis tracking solar energy project near Billings, Montana.  Since the proposed project is 80 MWs, it qualifies for development incentives under PURPA, 16 U.S.C. § 824a-3, and Montana's mini-PURPA, § 69-3-601(3), MCA.  After engaging with NorthWestern to negotiate a power purchase agreement ("PPA") and failing to agree to an avoided-capacity cost, MTSUN petitioned the PSC on December 23, 2016, to set the terms and conditions for the proposed project in accordance with the requirements of PURPA, 16 U.S.C. § 824a-3, and Montana's mini-PURPA, § 69-3-603, MCA.

MTSUN and NorthWestern's Negotiations

¶9     Prior to filing its petition with the PSC, MTSUN and NorthWestern were engaged in negotiations to establish the avoided cost rate and contract terms of the proposed project for nearly a year and a half.  On September 24, 2015, MTSUN emailed Bleau LaFave and Frank Bennett of NorthWestern indicating its desire to secure avoided-cost pricing from NorthWestern for its potential qualifying facility development in Montana.  After a few preliminary emails between the parties, NorthWestern failed to respond to MTSUN for nearly six months, despite MTSUN's continued attempts to discuss the project and

---

[2] The regulation, as well as Montana's mini-PURPA, § 69-3-603, MCA, assumes the parties have been engaged in negotiations that have come to an impasse.

avoided-cost negotiations. On March 11, 2016, MTSUN filed an informal complaint with the PSC against NorthWestern arguing that NorthWestern's refusal to respond was creating a barrier to market entrance of MTSUN's QF in contradiction of PURPA's intent and requirements of encouraging QF development, 16 U.S.C. § 824a-3(a).

¶10   NorthWestern then responded to MTSUN's previous emails on April 1, 2016, requesting additional data. MTSUN replied on April 7, 2016, with the additional data and requested that NorthWestern provide it with forecast avoided-cost information. NorthWestern responded on April 29, 2016, requesting more information regarding the project, including MTSUN's fully executed Large Generator Interconnection Agreement ("LGIA"). MTSUN responded and informed NorthWestern that an executed LGIA was not a prerequisite to NorthWestern's duty to calculate a forecasted avoided cost for the MTSUN project. On May 2, 2016, MTSUN again contacted the PSC to obtain an order or ruling on whether a fully executed LGIA was a legal prerequisite to a QF obtaining forecast avoided-cost pricing from a Montana utility. The PSC concluded that there is no legal requirement that a QF provide a utility with a fully executed LGIA prior to receiving forecasted avoided-cost pricing.

¶11   On May 13, 2016, NorthWestern sent an email to MTSUN with its first estimate of its avoided costs for the MTSUN project. MTSUN did not agree that the calculation and the information supporting it was compliant with PURPA or its federal or state implementing regulations and responded to NorthWestern's estimates seeking more information regarding the avoided-cost calculations. On May 19, 2016, NorthWestern then

7

provided MTSUN with a comprehensive estimate of the avoided costs arriving at $46.64/megawatt hour (MWh). MTSUN was requesting $53.26/MWh in avoided costs.

¶12 On May 31, 2016, MTSUN formally requested a PPA from NorthWestern. On June 17, 2016, MTSUN and NorthWestern held a conference call discussing further avoided-cost forecasting and NorthWestern's methodology. During this conference call, NorthWestern indicated that it was awaiting the outcome of another PSC proceeding, *In re Greycliff Wind Prime, LLC*, Docket No. D2015.8.64, Order No. 7436d, and that until the PSC ruled in that case, its avoided-cost method could not be altered, delaying avoided-cost negotiations with MTSUN.

¶13 On June 20, 2016, NorthWestern provided MTSUN with its first draft of the proposed PPA, to which MTSUN responded four days later with its proposed revisions. On July 11, 2016, NorthWestern provided MTSUN with a completely new avoided-cost rate of $35.48/MWh, more than $11/MWh lower than its earlier offer of $46.64/MWh. MTSUN disagreed and countered with a calculation of $54.19/MWh. On July 20, 2016, NorthWestern responded that it had made an error in its latest avoided-cost calculation. On July 29, 2016, NorthWestern provided an updated avoided-cost estimate of $45.78/MWh, its third estimate.

¶14 On September 9, 2016, after continued negotiations, NorthWestern again altered the avoided-cost proposal and provided MTSUN with its fourth avoided-cost estimate of $39.14/MWh, over $6/MWh lower than its third estimate. MTSUN then responded requesting additional information regarding the decrease by about $6/MWh from its July 29, 2016 estimate. Once again, NorthWestern responded that it had made an error in its

8

calculation and sent a corrected calculation of $41.77/MWh, its fifth avoided-cost calculation. MTSUN disagreed and the President of MTSUN stated the following in reply:

> As you are aware, avoided cost is essential in making a sound and prudent business decision to proceed with project development. Uncertain avoided costs, or costs that are all over the place does not provide developers with any assurance hindering our ability to move forward with our project.
>
> As you can see per the pricing history below, we have never seen such wide "swings" in any other utilities [sic] avoided cost calculations in such short span of time (May 2016-September 2016) and given that we are at this since October of 2015 I would ask for my last call to go over the following with our and your experts next week. We would ask for next Friday for a conference call to put this matter to rest.
>
> Lastly, I would like to formally ask a member of the Montana Public Consumer advocate or PSC to be also present for this call.

Email from Ros Rocco Vrba, MTSUN President, to NorthWestern representatives (September 9, 2016).

¶15    On November 23, 2016, after continued negotiations and having received a revised draft of the PPA from NorthWestern, MTSUN again responded with comments and suggested edits to the PPA. In response, on November 30, 2016, NorthWestern sent MTSUN a revised 25-year avoided-cost rate of $43.48/MWh inclusive of carbon, its sixth and final avoided-cost calculation. NorthWestern's proposed avoided-cost rate included: (1) the avoided cost of energy inclusive of carbon of $40.86/MWh; (2) the avoided-capacity cost of $5.57/MWh using a capacity contribution percentage of 7.8%; and (3) an adjustment of -$2.95 for regulation, spinning reserves, and supplemental reserves.

¶16    While MTSUN generally agreed with the avoided cost of energy, it disagreed with NorthWestern's calculation of the capacity contribution of its project. MTSUN's proposed

9

energy avoided costs, including carbon, was actually slightly lower than NorthWestern's at $40.18/MWh. However, MTSUN calculated a capacity contribution of around $20/MWh and a total avoided-cost rate of $63.70/MWh.

¶17 The major difference in the overall price between the parties concerned the methodologies used to calculate capacity avoided costs. MTSUN relied on a proxy method using a power plant that NorthWestern was proposing to build in the near future as stated in its 2015 Integrated Resource Plan, which was an internal combustion engine ("ICE") unit. NorthWestern was relying on the peaker method, thus using the utility's least cost resource as a comparison for avoided costs that the MTSUN project would provide.

¶18 On December 21, 2016, MTSUN returned a signed PPA to NorthWestern containing its final edits. At this point, while NorthWestern had not executed the PPA, MTSUN asserted that it had committed itself to sell electricity to NorthWestern, thereby incurring a LEO. The parties were in agreement on virtually all material terms. Regarding avoided energy costs with a carbon adder, MTSUN calculated $40.18/MWh and NorthWestern calculated $40.86/MWh. Both parties were in agreement on a 25-year contract term. However, negotiations regarding capacity contribution had stalled out.

MTSUN's Petition to the PSC

¶19 On December 23, 2016, after being unable to agree on capacity avoided costs, MTSUN filed its petition with the PSC to establish the terms of its PPA with NorthWestern.[3] In its petition, MTSUN requested that the PSC "resolve any potential

---

[3] On January 6, 2017, MTSUN amended and resubmitted its petition since the PSC did not accept MTSUN's December petition as complete.

dispute that may arise regarding [NorthWestern's] obligation to purchase MTSUN's electric generation and affirm the proposed form of PPA in accordance with M.C.A. § 69-3-603 . . . ." MTSUN requested $63.70/MWh in total avoided costs, which relied on the proxy method to calculate energy avoided costs inclusive of carbon of $40.18/MWh, capacity avoided costs of $25.36/MWh, and an adjustment for integration service costs of $1.84/MWh.

¶20 MTSUN specifically stated it particularly "disagreed with [NorthWestern]'s capacity contribution of the MTSUN project, although attempts to further negotiate were stonewalled by [NorthWestern]." MTSUN asserted it was appropriate to use all 12 months of the year to calculate MTSUN's capacity contribution factor. The project would deliver capacity during peak hours to help NorthWestern close its 28% capacity deficit throughout all 12 months and the project would displace some of NorthWestern's planned summer capacity that may otherwise be provided by a portfolio of planned gas-fired resources (NorthWestern's 2015 Integrated Resource Plan indicated it intended to build nearly 686 MWs of new gas fired resources over the next decade). Regarding energy avoided costs, MTSUN requested a slightly lower energy avoided-cost rate of $27.33/MWh ($40.18/MWh with a carbon adder) than NorthWestern's November 30, 2016 offered rate of $28.68/MWh ($40.86/MWh with a carbon adder).

¶21 In its petition, MTSUN also contended that NorthWestern "utilized delay tactics, such as not responding to MTSUN's request for information and [sending] conflicting and unjustified forecast avoided-cost estimates to stymie MTSUN's ability to obtain a PPA to sell its energy and capacity to [NorthWestern]." MTSUN asserted NorthWestern's actions

11

during negotiations were inconsistent with PURPA, Montana's mini-PURPA, and the federal and state regulations implementing those statutes. MTSUN also alleged that NorthWestern's numerous and varied avoided-cost calculations: "(1) [were] inconsistent with PURPA and Montana Law; and (2) were not calculated in a manner consistent with approved and existing methodologies in Montana." Further, MTSUN asserted that NorthWestern's wide-ranging estimates of avoided-costs forecasts for the MTSUN project were contrary to well-known and established fuel commodity prices in the United States.

The PSC's Orders

¶22 After MTSUN filed its petition, the PSC granted intervention motions to NorthWestern, the Montana Department of Natural Resources and Conservation ("DNRC"),[4] and the Montana Consumer Counsel on January 25, 2017. The PSC held a hearing on April 28, 2017, and a work session on June 29, 2017. On July 21, 2017, the PSC issued its Final Order 7535a setting the contract terms and rates for the MTSUN project. *In re MTSUN, LLC*, D2016.12.103, Order No. 7535a (Jul. 21, 2017).

¶23 The PSC's Final Order No. 7535a altered all the terms of NorthWestern and MTSUN's PPA, including those terms on which the parties had essentially reached agreement. The PSC determined that MTSUN had not established a LEO since MTSUN's avoided-cost calculations were inconsistent with NorthWestern's. The PSC dropped the avoided energy cost rate to $16.98/MWh, concluded that carbon costs would no longer be

---

[4] Since MTSUN had an executed lease with DNRC on school trust land that would provide an estimated annual tax revenue of around $1.15 million to the State of Montana, DNRC became an interested party.

included in the avoided-cost calculations since the current federal administration had an oppositional view to emission regulation, calculated an avoided capacity cost rate of $10.53/MWh, to be paid only in peak load hours, and reduced the PPA contract length from 25 to ten years. Order No. 7535a, ¶¶ 128-132. The PSC also, in a stated effort to avoid an appearance of discrimination against QFs, ordered that the ten-year contract length be applied symmetrically to NorthWestern's other utility assets. Order No. 7535a, ¶ 112.

¶24 MTSUN and NorthWestern each requested reconsideration of the order. MTSUN raised five issues for reconsideration: (1) the PSC's finding that MTSUN did not establish a LEO; (2) the PSC's avoided energy cost calculation; (3) the PSC's decision to exclude carbon adjustments; (4) the PSC's avoided capacity cost calculation; and (5) the PSC's decision to set a 10-year contract length for the PPA. NorthWestern requested reconsideration on the PSC's symmetrical application of the ten-year contract term to its other resources. NorthWestern asserted, inter alia, that ten years was too short since NorthWestern's 2015 Integrated Resource Plan identifies needs over a 20-year planning horizon and that a short ten-year contract term conflicts with the PSC's rules regarding a planning horizon.

¶25 On November 29, 2017, the PSC issued its Order on Reconsideration, Order No. 7535b, in response to MTSUN and NorthWestern's requests. In Order No. 7535b, the PSC amended its earlier contract length decision of ten years to 15 years and maintained its symmetry finding to NorthWestern's other assets. The other issues raised by MTSUN remained unchanged.

*Whether MTSUN Incurred a LEO*

¶26     The PSC concluded MTSUN had not established a LEO and rejected MTSUN's

assertion that the PSC's own *Whitehall Wind* LEO test was unlawful per FERC's *FLS*

*Energy* declaratory order.  *See FLS Energy*, 157 FERC at 61731.[5]  Accordingly, the PSC

applied the two-prong test that it established in the *Whitehall Wind* decision, which requires

that: (1) the QF tendered a power purchase agreement to the utility "*with a price term*

*consistent with the utility's avoided costs*," with "specified beginning and ending dates,"

and with "sufficient guarantees to ensure performance" during the term of the contract; and

(2) the QF must tender "an executed interconnection agreement."  Order No. 7535a, ¶ 35

(emphasis added).  While FERC declared the *Whitehall Wind* LEO test to be unlawful and

inconsistent with PURPA, *see FLS Energy,* 157 FERC at 61731, the PSC justified its

continued reliance on the *Whitehall Wind* LEO test on the basis that only prong two of the

test was invalidated by FERC's decision and noted that FERC's declaratory order was

advisory only and non-binding unless enforced in federal court.[6]  Order No. 7535a, ¶¶ 35,

41; Order No. 7535b, ¶ 120.

---

[5] In *FLS Energy*, FERC declared the PSC's LEO test unlawful but declined to take enforcement action.  Since FERC's declaratory judgments are non-binding, the PSC continued applying its *Whitehall Wind* LEO test.

[6] The parties in *FLS Energy* did pursue litigation in the United States District Court for the District of Montana.  *See Bear Gulch Solar, LLC v. Mont. PSC*, 356 F.Supp.3d 1041 (D. Mont. 2018).  The court upheld FERC's declaratory order concluding that the PSC's *Whitehall Wind* LEO test was unlawful.  *Bear Gulch*, 356 F.Supp.3d at 1051-52.  However, the Ninth Circuit overruled the district court's decision finding that the issue was moot since the PSC had initiated rulemaking to change its LEO test.  *See Bear Gulch Solar, LLC v. Mont. PSC*, 775 Fed. Appx. 295 (9th Cir. 2019).  While the PSC no longer requires a *fully executed* interconnected agreement, prong one, which is at issue here, remains in its revised LEO test.  *See* Admin. R. M. 38.5.1909.

14

¶27 The PSC found that MTSUN's estimate of $63.70/MWh ($40.18/MWh for avoided-energy costs inclusive of carbon and $25.36/MWh for capacity-avoided costs) was 70% higher than the PSC's avoided-cost estimate of $37.55/MWh. Order No. 7535a, ¶ 42. The PSC concluded that since NorthWestern "gave MTSUN several avoided-cost calculations throughout the negotiations and MTSUN did not adequately explain why it did not accept the rates," MTSUN did not sufficiently commit itself to selling energy and a LEO was not established. Order No. 7535b, ¶ 18. Therefore, it did not meet the first prong of the *Whitehall Wind* LEO test.

*Avoided Energy Cost Calculations*

¶28 The PSC estimated the avoided energy costs without a carbon adder of the MTSUN project to be $17.40/MWh. Order No. 7535a, ¶¶ 61, 90; Order No. 7535b, ¶ 69. While the PSC acknowledged that a "QF is not required to predict the precise avoided cost," Order No. 7535a, ¶ 36, and MTSUN and NorthWestern's avoided-cost-of-energy calculations were virtually identical, the PSC decided to calculate a new avoided energy cost. Since the PSC found that MTSUN did not incur a LEO, the PSC determined that it was not obligated to base its avoided-cost calculation on forecast energy cost information available to the parties at the time of MTSUN's petition filing in December 2016 and chose to rely on March 2017 forward prices to estimate avoided energy costs.[7] Order No. 7535b, ¶¶ 60-62.

---

[7] MTSUN argued the PSC's reliance on March 2017 forward prices resulted in deflated avoided-cost calculations since forward wholesale market prices are seasonally dependent, and the March 2017 forward prices were affected by atypically high generation because of performance related to hydro facilities in the Pacific Northwest due to it being an abnormally high runoff year.

¶29 The peaker method used by the PSC based the avoided costs on NorthWestern's least-cost portfolio of resources and under the assumption that NorthWestern is operating under a "long-1 position."[8] Order No. 7535a, ¶¶ 46-47, 51. Specifically, that method provides that "NorthWestern assigns a new facility's projected energy production a value equal to the dispatch cost of the marginal unit in NorthWestern's control, and not the market price, when the utility's customer loads are fully supplied from NorthWestern's owned or contracted resources and when the market price is higher than those dispatch costs."[9] Order No. 7535b, ¶ 65. Accordingly, in operating under the long-1 position, the PSC relied on "only existing resources' dispatch costs" for calculating MTSUN's avoided energy costs. Order No. 7535b, ¶ 65.

*Exclusion of the Carbon Adder Adjustment*

¶30 The PSC opted to exclude costs attributable to the potential future regulation of carbon dioxide emissions. The PSC adopted the same findings it used in *Vote Solar* by declining to use a carbon emission adjustment for calculating avoided-cost estimates for MTSUN. Order No. 7535b, ¶ 78; *Vote Solar*, ¶¶ 25, 40-46. The PSC concluded that

---

[8] NorthWestern defines its "long-1 position" as occurring when "NorthWestern's supply is greater than load and at least one of its dispatchable generation resources costs less than the current market price; in this case, MTSUN's output avoids the running cost of the marginal dispatchable resource."

[9] While the PSC relied on NorthWestern's long-1 position, record evidence indicates that NorthWestern is not in fact capable of meeting customer loads through its owned or contracted resources since it has a 28% capacity deficit (NorthWestern's owned or contracted resources can supply around 900 MWs, while its peak loads in summer and winter demand around 1200 MWs). When NorthWestern is unable to meet customer load with its supply, it must purchase energy on the open market from nearby utilities, including Bonneville Power Administration and others.

"including unknown future costs for carbon dioxide emissions in an avoided-cost calculation unnecessarily exposes customers to risk." Order No. 7535b, ¶ 70.

¶31 This decision was contrary to its decision in *In re Crazy Mountain*, Docket D2016.7.56, Order No. 7505b (Dec. 22, 2016), which was issued one day before MTSUN filed its petition with the PSC. In *Crazy Mountain*, the PSC established a carbon adder of $9.65/MWh for the time period of 2019-2043. Moreover, it was contrary to NorthWestern's own testimony that the PSC "could apply the same $9.65/MWh carbon adder it adopted in Order 7505b [*Crazy Mountain*]" to MTSUN's avoided-cost calculations. Order No. 7535a, ¶ 54.

¶32 As it did in the *Vote Solar* proceeding, the PSC justified departure from its own precedent, noting that "[a]ny observer would readily concede that the national political situation has been fluid and rapidly evolving, including with respect to the regulation of emissions such as carbon dioxide." Order No. 7535b, ¶ 77; *Vote Solar*, ¶ 25. The PSC based its decision on the current presidential administration's October 16, 2017 proposal to repeal the Clean Power Plan, stating that "unique uncertainty surrounds future emissions pricing." Order No. 7535b, ¶ 77.

*Calculation of Avoided-Capacity Costs*

¶33 The PSC adopted the "Southwest Power Pool" (SPP)[10] method to calculate MTSUN's avoided-capacity costs. In doing so, the PSC declined to adopt NorthWestern's 85/10 exceedance method that calculated a 9.6% capacity contribution and MTSUN's

---

[10] The SPP is a collective of regional power companies throughout the central United States. NorthWestern is not a member.

proposed method that calculated a 29.9% contribution ($25.36/MWh). The PSC also declined to adopt MTSUN's proposed methodologies used by six separate utilities throughout the western United States that offer capacity contributions for solar fixed axis systems ranging from 31% to 46%. Accordingly, in relying on the SPP method, the PSC determined a 6.1% capacity contribution for the MTSUN project, amounting to $10.76/MWh during on-peak hours (nearly $15/MWh less than MTSUN's calculation).[11] Order No. 7535a, ¶ 76; Order No. 7535b, ¶ 99. While NorthWestern had actually calculated a 0% capacity contribution using the SPP method, the PSC adjusted it upwards to 6.1% in accordance with its calculations in the *Vote Solar* docket since the analysis in that proceeding included locational diversity of sampled resources and the PSC did not conduct such analysis in MTSUN's proceeding. Order No. 7535b, ¶ 99. The PSC interpreted the SPP method in the same manner in the *Vote Solar* docket and relied only on the selection of top load hours from only the peak-load month of each year, i.e. 22 hours per year and 220 hours over the ten-year evaluation period. Order No. 7535b, ¶ 97; *see Vote Solar*, ¶ 24. The PSC also relied on an aeroderiviative ("AERO") unit coming online in 2019 as a proxy resource, instead of NorthWestern's three 18 MW ICE units planned for 2019, to compare MTSUN's avoided capacity costs. Order No. 7535a, ¶ 72; Order No. 7535b, ¶ 91. While the AERO unit was included in NorthWestern's 2015 plan as a potential resource to be constructed in 2025, the PSC acknowledged "the AERO unit is not

---

[11] In declining to rely on other regional utilities' solar capacity values, the PSC noted that MTSUN did not "provide sufficient justification for the use of the other utilities' solar capacity values . . . ."

a[] [preferred] resource in NorthWestern's 2015 plan," but found that "its fixed costs are a proxy for the capacity value of the 2015 Plan's selected ICE unit." Order No. 7535a, ¶ 72.

*Contract Length of the PPA*

¶34    Regarding its decision to cut MTSUN's contract length from 25 to 15 years, the PSC determined that "a 15-year maximum contract length was reasonable and in the public interest, enhances economic feasibility of MTSUN, and was supported by record evidence and precedent." Order No. 7535b, ¶ 47 (overturning its prior decision in Order No. 7535a that concluded a ten-year contract length was reasonable). While MTSUN and NorthWestern agreed regarding the 25-year contract length and this issue was not disputed, the PSC reasoned that 15 years was lawful. The PSC acknowledged that none of the parties advocated for or supported a 15-year contract length,[12] but relied on a North Carolina utility commission decision to limit QF contracts to 15 years. Order No. 7535b, ¶ 41.

¶35    The PSC relied on much of the same reasoning that it asserted in the *Vote Solar* proceeding, *see Vote Solar*, ¶¶ 29-30, to support its decision to depart from its recent precedent of 25-year QF contracts. The PSC rejected the use of its own definition of "long-term" as defined in Admin. R. M. 38.5.8202(7) to QF contracts, finding that while the definition provides guidance in defining a "long-term" contract, it fits more appropriately in the context of electricity supply resource planning and procurement and is therefore of limited applicability to QF contracts. Order No. 7535b, ¶¶ 31-32. The PSC also cited to the record in the *Vote Solar* proceeding to support its conclusion that 15-year

---

[12] The Consumer Counsel had advocated for a maximum contract length of 20 years.

19

contract lengths were sufficiently long to make QFs economically feasible. Order No. 7535b, ¶ 35. However, in *Vote Solar*, ¶ 71, we held the PSC's statement that the appellees in *Vote Solar* supported a 15-year contract was erroneous. Like the QFs in *Vote Solar*, MTSUN stated that shortening the contract length to less than 25 years without a higher avoided-cost price would render the project economically infeasible since "the economic feasibility of the project is dependent upon contract length, and that for a shorter contract, MTSUN would require a higher price" to allow for reasonable certainty of return on investment for its investors, as required by FERC Order No. 69, 45 Fed. Reg. at 12218. Order No. 7535b, ¶ 42.

¶36    The PSC noted the willingness of MTSUN to accept an abbreviated contract length in exchange for a higher price. However, the PSC concluded that it does not have the legal authority to inflate the avoided-cost rate in order to encourage MTSUN to accept its decision to reduce its contract length from 25 to 15 years. Order No. 7535b, ¶ 43. Accordingly, the PSC rejected MTSUN's contention that in order to encourage and enhance the economic feasibility of QF projects, shorter contract lengths must be accompanied by higher avoided-costrates.

*PSC Staff Memo*

¶37    On October 3, 2017, in response to MTSUN's and NorthWestern's motions for reconsideration of the PSC's Final Order No. 7535a and prior to the PSC's issuance of Order No. 7535b, the PSC staff released a memo recommending reconsideration of its

decisions on avoided energy costs, the exclusion of carbon costs, and contract length.[13] Aside from requesting interested parties to initiate rulemaking to address the PSC's LEO test, *see* Order No. 7535b, ¶ 20, the PSC in Order No. 7535b did not adopt the recommendations made in the staff memo.

¶38 Staff suggested that the PSC reconsider its decision on MTSUN's avoided energy costs and adopt a rate for avoided energy costs reflective of the $28.68/MWh price that NorthWestern offered MTSUN in November 2016 just prior to MTSUN's petition. Staff reasoned that "MTSUN and NorthWestern were in virtual agreement regarding the level of avoided energy costs" and that "it would be reasonable for the Commission to focus its decision in this case on those matters involving substantial dispute between the parties, particularly given guidance from FERC favoring amicable QF contract formation." Staff further provided that NorthWestern's offered avoided energy cost of $28.68/MWh for a 25-year contract "reasonably reflects estimates of NorthWestern's avoided energy costs based on a methodology the Commission has applied in prior QF cases, and that offer should be approved."[14] Staff concluded that under PURPA and Montana law a "QF should

---

[13] The PSC staff also discussed the LEO and avoided capacity costs issues. Regarding the LEO issue, the staff recommended that the PSC "initiate an informal rulemaking to receive input on potentially adopting a new LEO rule" since FERC invalidated the *Whitehall Wind* standard in *FLS Energy*. Regarding avoided capacity cost, staff recommended denying MTSUN's request to modify the capacity contribution calculations on the basis that the use of the SPP method was "consistent with the SPP method adopted by the Commission in Order 7500c." This is the same method which this Court in *Vote Solar*, ¶ 64, concluded was arbitrary and unreasonable.

[14] Staff also noted that in addition to not disputing the $28.68/MWh calculation, NorthWestern also responded to a data request by the PSC during the proceeding that calculated a similar avoided energy cost of $26.96/MWh.

21

not lose the benefit of an agreement on certain contract elements simply by petitioning the Commission to resolve other contract elements."

The District Court's Order Reversing the PSC's Decision

¶39 MTSUN appealed the PSC's Order on Reconsideration, Order No. 7535b, to the Eighth Judicial District Court, Cascade County, for judicial review of the entirety of the PSC's Order on Reconsideration No. 7535b. On June 18, 2019, the District Court reversed and remanded the PSC's Order No. 7535b based on findings of violations of due process, PURPA, and Montana's mini-PURPA. In accordance with its authority to affirm, reverse, remand, or modify a PSC determination under § 2-4-704(2), MCA, the District Court granted the relief requested by MTSUN and remanded the case to the PSC with the following specific instructions:

(a) The Commission must assign MTSUN a 25-year contract length.
(b) The Commission must assign MTSUN a price for carbon. The appropriate price is $9.65/MWh as calculated by the [PSC] staff for this proceeding.
(c) MTSUN incurred a LEO as of December 23, 2016 and is entitled to the avoided cost of energy NorthWestern and MTSUN agreed upon directly prior to MTSUN's filing of its petition with the Commission, which is $28.68/MWh.
(d) The Commission must calculate an avoided cost of capacity for MTSUN based on an 18 MW internal combustion engine, as specified in NorthWestern's 2015 IRP [Integrated Resource Plan].

¶40 The District Court's decision was based on its determination that MTSUN's right to due process was violated, that a LEO had already been established, that the PSC arbitrarily eliminated a carbon adder, the PSC arbitrarily relied on an AERO unit in calculating avoided-capacity costs, and the PSC arbitrarily established 15-year contract lengths.

22

*Due Process Violations*

¶41 The District Court first found that MTSUN's right to due process was violated since the PSC was not an impartial tribunal and that its decisions lacked "legal and evidentiary support and can only be explained by bias and policy preference of the PSC members." During the District Court proceeding, MTSUN augmented the record to include three op-eds criticizing solar QF development published by Commissioners Johnson, Koopman, and O'Donnell while MTSUN's case was pending and a "hot mic" recording of Commissioner Lake recorded during a break in a PSC work session in the *Vote Solar* docket.

¶42 The court found that while the MTSUN proceeding was ongoing before the PSC's jurisdiction, four of the five individual Commissioners actively demonstrated personal disdain for solar developers, concluding that the "published opinion articles criticizing solar developers are evidence of bias on the part of the Commissioners." This conclusion was bolstered by evidence of Commissioner Lake's "hot mic" recording discussing how a 10-year contract term and low avoided-cost rate would kill QF development in Montana altogether and that "dropping the rate that much probably took care of the whole thing."

¶43 In evaluating the actions by the Commissioners, the District Court concluded that the PSC "improperly attempted to act as a quasi-legislative body by implementing new policy rather than acting as an impartial trier of fact, a position the Commission's legal counsel acknowledged at hearing." Accordingly, the District Court concluded that

23

MTSUN did not receive a fair hearing on its petition and its due process rights had been violated.[15]

*Legally-Enforceable Obligation and Avoided Energy Costs*

¶44 The District Court found that a LEO was established on December 23, 2016, at the time MTSUN filed its petition with the PSC, and the PSC's contrary finding was a violation of PURPA as-applied to the MTSUN project. The court found that the record demonstrated unrefuted evidence that NorthWestern and MTSUN were "virtually in agreement on the avoided cost of energy (with NorthWestern's number actually being slightly higher), and that the only difference in price term was the result of not knowing how the Commission would choose to value solar project capacity." Accordingly, the court concluded that a "correct application of PURPA would establish a LEO date for MTSUN as December 23, 2016, when MTSUN filed its petition with the Commission." As a result of finding a LEO existed, the District Court found that the correct price for the avoided energy cost rate was $28.68/MWh, the price that NorthWestern submitted to MTSUN on November 30, 2016, just before MTSUN filed its petition with the PSC and the parties were virtually in agreement.

---

[15] Additionally, the District Court found that the PSC's reliance on Northwestern's use of the proprietary software, PowerSimm, in establishing avoided-cost calculations lacked transparency and failed to satisfy due process requirements. The District Court held that the PSC must "require all parties to have access to information it uses in making its final determinations of contested issues." The PSC has since issued Admin. R. M. 38.5.1910, which requires NorthWestern to provide its avoided-cost modeling data to QFs. Accordingly, this issue is moot.

*Carbon Adder*

¶45 The District Court held the PSC was arbitrary and capricious in its decision to eliminate the carbon pricing adder for the MTSUN project. The District court found that such a decision departed from PSC precedent and that the PSC provided "no evidence that the information it claims to have based its decision on was part of the record evidence." The District Court determined that "[b]ased on the lack of record evidence, Commission precedent, and the applicable standard, MTSUN is entitled to a carbon adder of $9.65 per MWh as recommended by staff based on the Commission precedent from the Crazy Mountain Wind docket."

*Avoided-Capacity Cost Calculation*

¶46 The District Court held the PSC's decision to rely on a least-cost AERO unit, rather than an ICE unit, in calculating the avoided capacity costs, "was arbitrary and designed to result in an artificially lower price." The court found persuasive that capacity payments must be based on the avoided costs of the next planned generation unit in NorthWestern's 2015 IRP, which was an ICE unit, not an AERO unit. The District Court agreed with MTSUN that while the "project does not provide exactly the same services as an ICE unit [or an AERO unit] . . . the capacity payment will take into account these differences" since MTSUN will only be paid avoided capacity costs when it is contributing capacity during peak load hours, "and therefore the avoided cost only compensates MTSUN for the amount that will be offset." Accordingly, the District Court held that using an ICE unit was proper since avoided cost must be based on current data as required by *Whitehall Wind, LLC v.*

*Mont. Pub. Serv. Comm'n,* 2010 MT 2, ¶ 21, 355 Mont. 15, 223 P.3d 907 (*Whitehall Wind I*).

*Contract Length*

¶47 The District Court held that the PSC's decision to limit the contract length to 15 years was clearly erroneous based on the lack of record evidence from the PSC proceeding. The District Court found that MTSUN and NorthWestern did not dispute that 25 years was an appropriate contract length for the project, and no testimony was provided in support of a 15-year contract. The District Court agreed with MTSUN's argument that the PSC's 15-year contract limitation was "both arbitrary and contrary to Montana law requiring the Commission to encourage long-term contracts 'to enhance economic feasibility of' qualifying facilities." Section 69-3-604, MCA.

NorthWestern's Motion to Stay the District Court's Order

¶48 On July 15, 2019, NorthWestern filed a motion with this Court to stay the District Court's order. NorthWestern also had requested the District Court to stay its order, which was denied. MTSUN opposed both motions. On August 6, 2019, this Court denied NorthWestern's motion, in part because MTSUN "allege[d] it would personally suffer harm if the stay is granted," and NorthWestern "acknowledged that it will not suffer irreparable harm if the stay is denied."

Order No. 7535c In Response to the District Court's Decision

¶49 On July 17, 2019, the PSC issued Order No. 7535c to comply with the District Court's decision. In accordance with the District Court's instructions, the PSC recalculated

MTSUN's avoided capacity costs based on an 18 MW ICE unit, NorthWestern's next planned generating unit, resulting in a capacity avoided cost of $14.07/MWh.

¶50 Since the PSC disagreed with the District Court's decision, the PSC, in "protest" of its compliance filing, directed NorthWestern to "include a contractual provision in any MTSUN PPA which indicates the PPA is terminated or void if the June 18 District Court Order is overturned or altered in any manner by the Montana Supreme Court on appeal."[16] The inclusion of that clause had the practical effect of circumventing this Court's decision to deny NorthWestern's motion to stay the District Court's order since the effect resulted in MTSUN declining to engage in the PPA process. As MTSUN explained, "while MTSUN may now technically enter into a contract, it is not a financeable contract because it has no certainty until after this Court has acted," resulting in MTSUN being in the same position had either court issued a stay.

## STANDARDS OF REVIEW

¶51 The Montana Administrative Procedures Act ("MAPA") standards of review govern an administrative appeal of an agency decision in a contested case. Section 2-4-704, MCA; *Whitehall Wind, LLC v. Mont. Pub. Serv. Comm'n*, 2015 MT 119, ¶ 7, 379 Mont 119, 347 P.3d 1273 (*Whitehall Wind II*). This Court reviews an administrative decision in a contested case to determine whether the agency's findings of fact are clearly

---

[16] During the PSC's July 16, 2019 work session to discuss Order No. 7535c, the Commissioners had a discussion to "protest" their compliance filing by including the opt out provision. Commissioner Lake, in support of including the protest provision stated, "If we put that . . . statement in . . . I think I can stay comfortable that we have followed the court, but we've also held strong with our position." Commissioner Koopman abstained from voting on the compliance filing since he disagreed with the court's order and believed the District Court judge was biased.

27

erroneous and whether its interpretation of law is correct. *Whitehall Wind I*, ¶ 15. A party seeking judicial review of an agency decision is "entitled to have the court's decision based on a review of the complete administrative record." *Owens v. Mont. Dep't of Revenue*, 2006 MT 36, ¶ 14, 331 Mont. 166, 130 P.3d 1256; *see also Clark Fork Coal. v. DEQ*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482. The PSC's decision must be judged on the grounds and reasons set forth in the challenged order(s); no other grounds should be considered. *Montana-Dakota Utils. Co. v. Mont. Dep't of Pub. Serv.*, 223 Mont. 191, 196, 725 P.2d 548, 551 (1986) (citing *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 169, 83 S. Ct. 239, 246 (1962) (holding "if those grounds are inadequate or improper," based on the court's review of the record, "the court is powerless to affirm the administrative action")).

¶52 The Court may reverse or modify an agency decision if the substantial rights of a party have been prejudiced because the agency's decision exceeds its statutory authority, is affected by legal error, clearly erroneous in light of the whole record, arbitrary or capricious, or characterized by an abuse of discretion. Section 2-4-704(2)(a), MCA; *see also* § 69-3-402, MCA (providing that a party in interest dissatisfied with an order of the PSC setting or fixing rates may proceed in the district court to vacate the order on the grounds that it is unlawful or unreasonable). While agencies possess specific, technical, and scientific knowledge exceeding that of this Court, an agency must articulate a satisfactory explanation for its actions and provide a rational connection between the facts found and the choice made. *MEIC*, ¶ 26; *Clark Fork Coal.*, ¶¶ 27, 47; *Montana-Dakota Utils. Co.*, 223 Mont. at 196, 725 P.2d at 551. This Court will not defer to an agency's

incorrect or unlawful decisions but will only defer to an agency action within permissible statutory bounds. *MEIC*, ¶ 22.

## DISCUSSION

¶53    *Issue One: Whether the District Court erred in determining that the PSC arbitrarily and unlawfully found that MTSUN did not establish a legally-enforceable obligation under PURPA and therefore was not entitled to agreed-upon contract terms.*

¶54    Appellants first argue that, irrespective of the legality of the *Whitehall Wind* LEO test under PURPA, this Court lacks jurisdiction to review the PSC's LEO decision since MTSUN's LEO complaint is an implementation challenge, not as-applied, and federal courts have exclusive jurisdiction over PURPA implementation challenges. Second, NorthWestern argues that despite the unlawfulness of the PSC's *Whitehall Wind* LEO test, MTSUN did not incur a LEO.

*Jurisdictional Issue*

¶55    The PSC and NorthWestern's assertion that exclusive jurisdiction lies with federal courts in PURPA implementation challenges is incorrect. The issue of jurisdiction over implementation and as-applied challenges has long vexed utilities, QFs, state utility commissions, and even FERC itself. *Portland Gen. Elec. Co. v. FERC*, 854 F.3d 692, 697 (2017). The line between the two challenges is muddled and inconsistently applied—as evident by the PSC's inconsistent advocacy in this case compared to *Bear Gulch*, as well as other cases on this issue around the nation. *E.g. Vote Solar v. City of Farmington*, ___ F.Supp.3d ___, 2020 U.S. Dist. LEXIS 23425, *29-34 (D.N.M. Feb. 11, 2020) (providing a thorough review of inconsistent court holdings on this issue to date). Here, the PSC asserts that MTSUN's challenge to its application of the *Whitehall Wind* LEO test is an

implementation challenge; whereas, in the federal proceeding on this same issue, *Bear Gulch*, the PSC argued the challenge to the *Whitehall Wind* test was an as-applied challenge, thus barring the federal court from granting the plaintiffs in *Bear Gulch* their requested relief. *See Bear Gulch*, 356 F. Supp. 3d at 1043, 1052.

¶56 Federal courts have held that state-based adjudication serves as the "mainstay" for enforcing PURPA rights, particularly where a state-regulated power purchase agreement, not a FERC-approved tariff, is at issue. *Portland Gen. Elec.*, 854 F.3d at 698, 701-02; *see also FERC v. Mississippi*, 456 U.S. 742, 761, 102 S. Ct. 2126, 2138 (1982) (holding "federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery"). Indeed, § 210(g) of PURPA provides for state judicial review respecting "*any* proceeding conducted by a State regulatory authority" for purposes of "*implementing any requirement of a rule*" under § 210(a) 16 U.S.C. § 824a-3(g)(1) (emphasis added); *see also Rainbow Ranch Wind, LLC*, 139 FERC ¶ 61077, 61488 (Apr. 30, 2012) (holding a "state's implementation of PURPA and [FERC's] rules implementing PURPA may be challenged either through the state courts under section 210(g) of PURPA, or separately at [FERC] under section 210(h) of PURPA, or both"); Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978, 23 FERC ¶ 61304, 61644-45 (May 31, 1983). Convincingly, § 210(g) allows for judicial review in the "*same* manner, and under the same requirements," as judicial review may be obtained under 16 U.S.C. § 2633, of this title in the case of a proceeding to which § 123 applies. Section 123(c) states:

Any person (including the Secretary) may bring an action to enforce the requirements of this chapter in the appropriate State court, except that no such action may be brought in a State court with respect to a utility which is a Federal agency. Such review or action in a State court shall be pursuant to any applicable State procedures.

16 U.S.C. § 2633(c). Reading these provisions harmoniously so as to give each provision meaning and not to insert what has been omitted or to omit what has been inserted, § 1-4-101, MCA, it is clear that this Court has jurisdiction over MTSUN's LEO challenge. The statutes and the cases interpreting them certainly make it evident that state courts have jurisdiction over a QF's claim that a state agency improperly applied PURPA requirements to that QF.

¶57 We find persuasive the recent holding and analysis in *City of Farmington*. In *City of Farmington*, the court provided a thorough interpretation of how PURPA's judicial review sections, § 210(g) and (h) work together including the following excerpt:

> This Court interprets Section 210 [16 U.S.C. § 824a-3]to work like this: First, FERC issues a rule under Section 210(a). Second, a state PUC . . . implements that rule by incorporation into its procedures or regulations under Section 210(f). Then, an aggrieved party may challenge in state court whether or not that PUC['s] . . . actions comply with FERC's requirements under Section 210(g). If a PUC . . . outright fails to implement a FERC rule, FERC (or a petitioning party on FERC's behalf) may step in and force them [to] do so under Section 210(h), either through FERC administrative proceedings or in federal district court. This reading moves away from the "application" and "implementation" debate and focuses on distinguishing compliance with FERC rules versus compliance with PURPA's mandate to make reasonable implementation efforts. Federal jurisdiction under Section 210(h) should not be stretched to cover disputes over *how well* a regulatory entity implements FERC's rules or the propriety of that entity's state or local rules.

31

*City of Farmington*, \*22 (emphasis in original).  Accordingly, the court held, "PURPA thus leaves post-implementation disputes in the hands of state courts" and provided that state jurisdiction would be proper where "a state PUC approved a utility's proposed rate that discriminates against renewable generators in violation of FERC's mandates."  *City of Farmington*, \*23.  We agree.[17]

*Lawfulness of the PSC's* Whitehall Wind *LEO Test*

¶58    The PSC's *Whitehall Wind* LEO test is inconsistent with PURPA and FERC's regulations.[18]  Prong one of the test requires that a QF "tender a PPA to the utility with a price term consistent with the utility's avoided cost." Order No. 7535a, ¶ 35.  The PSC asserts that prong one does not represent an insurmountable principle preventing QFs from ever being able to obtain a LEO but is a matter of timing.  Order No. 7535b, ¶ 19.  Based on this assertion, the PSC decided that MTSUN did not incur a LEO since NorthWestern gave MTSUN several avoided-cost calculations throughout the year and a half of negotiations and MTSUN did not accept NorthWestern's proposed avoided capacity cost rates.  Order No. 7535b, ¶ 18.

¶59    While FERC "gives deference to the states to determine the date on which a [LEO] is incurred, such deference is subject to the terms of [FERC's] regulations."  *Cedar Creek Wind, LLC*, 137 FERC at 61023.   Where a state utility commission "limits the

---

[17] This decision is limited to clarifying state court jurisdiction over PURPA disputes and does not purport to limit FERC's jurisdiction over these matters.

[18] The PSC has since amended its LEO test and dropped the second prong of the *Whitehall Wind* LEO test, consistent with FERC's order in *FLS Energy*.  *See* Admin. R. M. 38.5.1909.

methods . . . to only a fully-executed contract, the state's limitation is inconsistent with PURPA, and [FERC's] regulations implementing PURPA." *Cedar Creek Wind, LLC*, 137 FERC at 61024. Specifically, where a state utility commission narrowly defines a LEO "to encompass only a specific legal arrangement with all the relevant and material rates, terms and conditions," it is at odds with PURPA. New PURPA Section 210(m) Regulations, 71 Fed. Reg. at 64368.

¶60 As noted, FERC interprets a LEO as being broader than simply a contract between a utility and a QF and that the phrase is used to "prevent an electric utility from avoiding its PURPA obligations *by refusing to sign a contract*," or from "*delaying the signing of a contract*," so that "a later and lower avoided cost is applicable." *Cedar Creek Wind*, 137 FERC at 61024 (emphasis added); *FLS Energy*, 157 FERC at 61731. Moreover, FERC has found that extensive negotiations between parties are persuasive and point to the reasonable conclusion that a QF commits itself to sell electricity to the utility. *Cedar Creek Wind*, 137 FERC at 61025 n. 73 (concluding that the Idaho PUC's "rejection of the contract entered into by [the utility and QF], on the ground that the avoided-cost rate contained in the contract is excessive" was inconsistent with PURPA and FERC's regulations regarding LEO formation). Importantly, as noted above, "the establishment of a legally-enforceable obligation turns on the QF's commitment, and *not* the utility's actions*." FLS Energy, Inc.*, 157 FERC at 61730-31 (emphasis in original).

¶61 Relevant to our decision here, is this Court's decision in *Whitehall Wind II*. There we held that the PSC "did not exceed its statutory authority in concluding that evidence of a utility's refusal to negotiate, *without more*, is insufficient to establish that a [QF] has

33

committed itself to the proposed project."[19]  *Whitehall Wind II*, ¶ 17 (emphasis added).

In *Whitehall Wind II*, this Court reasoned that a LEO was not established since the QF did not take action that exposed it to liability if it abandoned the proposed project, including conducting avian studies, obtaining required permits, or having actual site control over any of the proposed project areas.  *Whitehall Wind II*, ¶ 17.

¶62    The PSC applied prong one of the *Whitehall Wind* LEO test, prescribed at Admin. R. M. 38.5.1909(1)(a)(ii), to unlawfully turn on NorthWestern's actions contrary to FERC's holding in *FLS Energy* and allows NorthWestern to delay or refuse to sign a contract with a QF so that a later and lower avoided cost is applicable, contrary to FERC's holding in *FLS Energy*.  *FLS Energy*, 157 FERC at 61731.

¶63    As demonstrated here, prong one thus allowed NorthWestern to delay the signing of a contract so that it would receive a lower avoided cost from the PSC.  MTSUN and NorthWestern were engaged in negotiations for over a year and a half prior to MTSUN filing its petition with the PSC.  For six months NorthWestern failed to even respond to MTSUN's negotiation attempts.  MTSUN was forced to file two complaints, one that NorthWestern's refusal to respond was creating a barrier to market entrance of its QF contrary to PURPA's intent, and the other that NorthWestern was unlawfully requesting information to delay forecast of avoided-cost information and negotiations.  After NorthWestern did respond with avoided-cost calculations, it proceeded to send several varied and inconsistent proposals and suggested that negotiations would have to be delayed

---

[19] In *Whitehall Wind II*, while the PSC had just announced the *Whitehall Wind* LEO test that is at issue here, we declined to opine whether it complied with PURPA. *Whitehall Wind II*, ¶ 18.

until the PSC issued Order No. 7436d. Also, it took the position that it would not sign a PPA until MTSUN submitted a copy of its signed interconnection agreement and studies regarding interconnection estimates. MTSUN argued those demands were contrary to PURPA's requirements, as held by FERC in *FLS Energy*, 157 FERC at 61731. Even after a year and a half of negotiations, multiple complaints to the PSC, and the petition process, the PSC held that MTSUN did not sufficiently commit itself to the development of its project since it did not accept NorthWestern's proposed avoided-cost rates and, and therefore, no LEO existed.

¶64 If the QF and the utility are totally in agreement on the avoided-cost calculations there would be little to no reason that a QF would petition the PSC pursuant to § 69-3-603, MCA, to determine the rates of a PPA since at that point a contract with the utility would be inevitable. Prong one of the PSC's LEO test, as applied here, requires that the QF and the utility must be in complete agreement on avoided costs prior to incurring a LEO. Such a requirement exceeds the bounds of PURPA and FERC's regulations regarding when a QF incurs a LEO since it essentially limits a QF's establishment of a LEO to a specific legal arrangement with all the relevant and material rates, terms, and conditions. New PURPA Section 210(m) Regulations, 71 Fed. Reg. at 64368. While the PSC stated that MTSUN was "not required to predict the precise avoided cost," Order No. 7535a, ¶ 36, its actions here say otherwise. MTSUN's and NorthWestern's avoided energy costs inclusive of carbon were less than a dollar of a difference with NorthWestern's proposed price of $40.86/MWh and MTSUN's at $40.18/MWh, yet the PSC determined these prices were not consistent and altered the avoided energy costs.

¶65 Clearly, MTSUN's difficult and drawn out negotiations with NorthWestern and its eventual petition to the PSC, sufficiently demonstrated its commitment to the development of its proposed project to establish a LEO. *Cedar Creek Wind*, 137 FERC at 61025. MTSUN also had actual site control over its proposed project areas, had conducted much of the necessary permitting, had submitted interconnection requests,[20] and initiated feasibility studies for interconnection. MTSUN had two land holdings, one with a private landowner and the other with the Montana DNRC. The first land holding had a fully executed and recorded lease that was in place for up to 30 years from the date the project achieved its commercial operations date. The agreement with DNRC was also fully negotiated and approved by the Montana Board of Land Commissioners for a period of up to 45 years. Additionally, MTSUN completed an environmental site assessment in May 2016, submitted its FERC form 556, obtained a right-of-way permit from Yellowstone County, was undergoing the Yellowstone County zoning compliance permitting process, and had scheduled its certificate of occupancy construction permit as well as other permits required upon receiving its construction permit. Certainly, unlike the QF in *Whitehall Wind II*, that relied on NorthWestern's refusal to negotiate "without more," MTSUN has done everything to create an obligation and has sufficiently committed itself to warrant the establishment of a LEO. *Whitehall Wind II*, ¶ 17.

¶66 Accordingly, we conclude that as applied to MTSUN's petition, the PSC's *Whitehall Wind* LEO test is unlawful under PURPA, FERC regulations, and Montana's

---

[20] On November 4, 2016, NorthWestern had accepted an interconnection request from MTSUN for the project to interconnect. *See* Order No. 7535a, ¶ 81.

36

mini-PURPA, § 69-3-603, MCA. To the extent the PSC still relies on or construes prong one in its current LEO test under Admin. R. M. 38.5.1909(1)(a)(ii), to require that a LEO is not established unless and until a QF and the utility reach an agreement on a avoided-cost figure, we direct the PSC to initiate rulemaking of a new LEO test consistent with this Opinion.

¶67 The District Court did not err in its decision concluding that the PSC's LEO determination was unlawful as a violation of PURPA as-applied to MTSUN. Accordingly, the District Court also did not err in finding that MTSUN established a LEO on the date of its petition to the PSC, December 23, 2016. A QF is entitled to its avoided-cost calculation "at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2)(ii). At the time MTSUN incurred its LEO, MTSUN and NorthWestern were virtually in agreement on the avoided cost of energy with a carbon adder for a 25-year term. The District Court correctly determined that MTSUN is entitled to the agreed-upon rate for energy of $28.68/MWh, a carbon adder of $9.65/MWh,[21] and a contract term of 25 years.[22]

¶68 Additionally, the PSC's decision to base MTSUN's avoided-cost calculation on March 2017 forward prices, rather than the information available to the parties at the time

---

[21] This is the same carbon adder figure calculated in the *Crazy Mountain Wind* docket that was decided at the time of MTSUN's petition to the PSC on December 22, 2016. *See* Order No. 7505b, ¶ 65. PSC staff had also recommended this same figure in its staff memo, and NorthWestern, during PSC proceedings, testified in agreement with this figure.

[22] We acknowledge that adding $28.68 and $9.65 does not amount to NorthWestern's November 30, 2016 figure of $40.86/MWh; however, the record is clear that NorthWestern's avoided energy cost amounted to $28.68/MWh at the time of MTSUN establishing its LEO and that the PSC, one day before MTSUN filed its petition, had determined that $9.65/MWh was a proper carbon adder figure.

MTSUN incurred its LEO in December 2016, is contrary to law. 18 C.F.R. § 292.304(d)(2)(ii) clearly requires that the data used to calculate the avoided costs must be based on current data at the time the LEO is established.

¶69    *Issue Two: Whether the PSC exceeded its authority in upending the parties' agreed-upon contract terms established by MTSUN's legally-enforceable obligation.*

¶70    Having determined MTSUN incurred a LEO on the date of its petition to the PSC, December 23, 2016, it is necessary to determine whether the PSC's decision to upend the agreed-upon terms of MTSUN's LEO was in excess of its authority. Section 2-4-704(2)(a)(ii), MCA. Administrative agencies have only the powers specifically conferred upon them by the legislature. *Bell v. Dept. of Licensing*, 182 Mont. 21, 22, 594 P.2d 331, 332 (1979). Under PURPA, a "state commission may comply with the statutory requirements by issuing regulations, by resolving disputes on a case-by-case basis, or by taking other actions reasonably designed to give effect to [FERC's] rules." *Mississippi*, 456 U.S. at 751, 102 S. Ct. at 2133. Montana's mini-PURPA specifically provides that "nothing in this chapter shall be construed as vesting judicial powers on said commission[.]" Section 69-3-103(1), MCA.

¶71    Clearly FERC has interpreted PURPA to encourage parties to enter into binding contracts themselves for the development of renewable energy resources. FERC has held that a state utility commission must not "create practical disincentives to amicable contract formation" between a QF and a utility. *Hydrodynamics, Inc.*, 146 FERC ¶ 61193, 61845 (Mar. 20, 2014). 18 C.F.R. § 292.301(b)(1) permits a QF and an electric utility to "agree to a rate for any purchase, or terms or conditions relating to any purchase" that may differ

38

from those that would otherwise be required by FERC's or a state utility commission's regulations concerning the determination of avoided-cost rates. In promulgating 18 C.F.R. § 292.301(b)(1), FERC reasoned that "a contracted-for-rate would never exceed true avoided costs and would thus be consistent with PURPA." Order No. 69, 45 Fed. Reg. 12,214, 12217-18; *Cedar Creek Wind,* 137 FERC at 61025. Further, 18 C.F.R. § 292.301(b)(2) provides that FERC's avoided-cost regulations, and the PSC's implementation of those regulations, do not affect the "validity of any contract entered into between a [QF] and an electric utility for any purchase." 18 C.F.R. § 292.301(b)(2); *see Cedar Creek Wind*, 137 FERC at 61025 n. 73 (finding that the Idaho PUC's alteration of contract terms that the QF and utility had agreed to prior to the proceeding was inconsistent with PURPA and FERC's regulations implementing PURPA); *see also Rainbow Ranch Wind, LLC*, 139 FERC at 61487. Specifically, in discussing the effect of 18 C.F.R. § 292.301, FERC explained that "the ability of [QFs] to negotiate with an electric utility is *buttressed* by the existence of the rights and protections of these rules." Order No. 69, 45 Fed. Reg. at 12217 (emphasis added).

¶72 The PSC's actions in this case are contrary to federal and state law, FERC regulations, and FERC precedent. Regardless of undergoing a lengthy negotiation process and incurring liability, as discussed above, the PSC rejected the agreed-upon terms of the parties upon the filing of MTSUN's petition and proceeded to alter terms that were not disputed by MTSUN or NorthWestern. The PSC's procedure is contrary to the principle that state regulators must not create practical disincentives to amicable contract formation and is the opposite of buttressing MTSUN's right to negotiate agreements with

39

NorthWestern. There would be no point to a QF negotiating terms with a utility, if, upon petition to a state PSC to adjudicate any disputed terms of a PPA, the terms that were agreed upon between the parties would be altered simply because the PSC decides a different term would be better. Clearly, in reviewing the regulations and FERC precedent, as well as taking into account general principles of contract law, a QF should not lose the benefit of agreement on certain contract elements upon petitioning the PSC to resolve disputed elements. *See Cedar Creek Wind*, 137 FERC at 61025 n. 73; *Hydrodynamics, Inc.*, 146 FERC at 61845.[23] A fundamental tenet of modern contract law is that the law presumes parties forming a contract "are in the best position to make decisions in their own interest" and a court should not upend mutually agreed terms. *Arrowhead Sch. Dist. No. 75 v. Kylap*, 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250; *Marco & Co. v. Deaconess/Billings Clinic Health Sys.*, 1998 MT 26, ¶ 16, 287 Mont. 293, 954 P.2d 1116 (holding a "court must not create a contract for the parties different from that actually entered into by them, unless the contract is a violation of public policy").

¶73 Furthermore, Montana law governing quasi-judicial procedure prohibits the PSC's action. In acting in a "quasi-judicial function" while adjudicating § 69-3-603, MCA, petitions, the PSC's review is limited to "making determinations in *controversies*."

---

[23] PSC staff also discussed FERC's precedent that the PSC must not create practical disincentives to contract formation and noted 18 C.F.R. § 292.304(e)(2)(iii)'s requirement that in adjudicating MTSUN's petition, the PSC must consider "the terms of any contract or other legally-enforceable obligation" and "defer principally to docket evidence." PSC staff noted that record evidence did not support the PSC's decision to alter the contract length and the avoided energy costs since MTSUN and NorthWestern were in agreement on those issues. Staff concluded that "as occurred here, it is possible that mutual agreement, or near agreement, might be achieved with respect to one or more elements of a contract"; a QF should not "lose the benefit of an agreement on certain contract elements" upon petition to the PSC.

Section 2-15-102(10), MCA (emphasis added). The PSC's review must be narrowed to only those controversies and issues that are disputed by the parties, not those issues on which the parties have reached mutual agreement. *See* § 69-3-603, *MCA* (allowing for a QF to petition when it and the utility are "unable to mutually agree"). The PSC has not been specifically conferred sua sponte authority allowing it to adjudicate undisputed issues.[24] Indeed, § 69-3-103, MCA, specifically provides that "nothing in this chapter shall be construed as vesting judicial powers on said commission." At the time that MTSUN established its LEO, the parties had reached mutual agreement on avoided energy costs with a carbon adder and a contract term of 25 years. Accordingly, these undisputed issues were not "controversies" and the PSC lacked authority to re-write them.

¶74    *Issue Three: Whether the District Court erred when it concluded that the PSC arbitrarily and unreasonably calculated MTSUN's capacity contribution in determining avoided costs.*

¶75    MTSUN argues that the PSC's choice to rely on an AERO unit was a violation of PURPA since NorthWestern's next planned generation unit to help meet its capacity deficit of 28% was three 18 MW internal combustion engine ("ICE") units scheduled to come online in 2019. MTSUN asserts that in relying on the AERO unit, the PSC arbitrarily assumed capacity would not be needed until 2025, even though NorthWestern had a 28% capacity deficit at the time of Order No. 7535b. The PSC asserts that its decision to rely

---

[24] Regardless, sua sponte authority is a power that is to be used "sparingly." *See City of Bozeman v. McCarthy*, 2019 MT 209, ¶ 32, 397 Mont. 134, 447 P.3d 1048; *see also Ekimian v. Immigration & Naturalization Serv.*, 303 F.3d 1153, 1156-57, 1161 (9th Cir. 2002) (discussing that even where an agency is specifically conferred sua sponte authority, sua sponte authority must be used sparingly as an "extraordinary remedy reserved for truly exceptional situations").

on the AERO unit was reasonable and supported by substantial evidence since MTSUN's solar project cannot perform the same functions as NorthWestern's planned 2019 ICE units.

¶76 There is no question that in setting purchase rates, the PSC must set the rate at the utility's "full avoided costs," meaning the rate to be paid by a utility for power is to be based on the utility's *actual* avoided costs at the time an obligation is incurred. *Am. Paper Inst. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 416, 103 S. Ct. 1921, 1930 (1983); *Indep. Energy Producers Ass'n v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 852, 858 (9th Cir. 1994); *see also Cal. PUC*, 133 FERC ¶ 61059, 61268 (Oct. 21, 2010); *Snow Mt. Pine Co. v. Mauldin*, 84 Or. App. 590, 600-01, 734 P.2d 1366, 1371 (1987). FERC has stated that "if a purchase from a [QF] permits the utility to avoid the addition of new capacity, then the avoided cost of the new capacity and not the average embedded system cost of capital should be used." FERC Order No. 69, 45 Fed. Reg. at 12,216. New capacity of a utility is based on the utility's "schedule for the addition of new generating and transmission facilities," meaning those resources planned for development contained in NorthWestern's integrated resource plan. FERC Order No. 69, 45 Fed. Reg. at 12,216; *see also Whitehall Wind I*, ¶ 27 (citing Admin. R. M. 38.5.1905 and holding the PSC must rely on current data in NorthWestern's integrated resource plan in calculating avoided costs). Indeed, FERC has specifically stated that "our regulations thus provide state commissions with guidelines on factors to be taken into account, 'to the extent practicable,' in determining a utility's avoided cost of acquiring the *next unit of generation*." *Cal. PUC*, 133 FERC at 61266 (emphasis added). Similarly, this Court has held that avoided costs

42

"must be reasonable and based on *current* avoided least cost resource data." *Whitehall Wind I*, ¶ 21 (citing *Indep. Energy Producers Ass'n*, 36 F.3d at 851-52; 18 C.F.R. § 292.304; § 69-3-604, MCA) (emphasis added).

¶77 As recognized by the PSC, the 2025 AERO unit is not a preferred resource in NorthWestern's 2015 plan, nor is it NorthWestern's next unit of generation. Order No. 7535a, ¶ 72. The PSC's decision to calculate avoided capacity cost data based on an AERO unit that is not NorthWestern's preferred next unit of generation results in the PSC failing to rely on NorthWestern's actual and full avoided costs contrary to PURPA, FERC regulations and precedent, and this Court's precedent. Avoided-cost calculations must be based on NorthWestern's next planned unit of generation. *Cal. PUC*, 133 FERC at 61266. Accordingly, the PSC acted unlawfully in relying on the 2025 AERO unit as a proxy for avoided capacity costs, instead of the new capacity provided by NorthWestern's next planned units of generation—the three ICE units planned for 2019.

¶78 Moreover, whether a QF can perform exactly the same services of a utility's next planned generation unit is not a factor that PURPA requires consideration of in determining avoided costs. *See* 18 C.F.R. 292.304(e). The differences in performance are taken into account in the avoided capacity cost payments since MTSUN is only compensated for avoided capacity costs when it is contributing capacity during NorthWestern's peak load hours. *See* Order No. 7535a, ¶ 76 (discussing the PSC's methodology and that the

calculation of avoided capacity costs is based on MTSUN's projected electricity production during peak load hours); Order No. 7535c, ¶ 6.[25]

¶79 The District Court did not err in determining that the PSC acted arbitrarily and capriciously in calculating MTSUN's avoided capacity cost rates. Consistent with the District Court's instructions on remand, the PSC issued its compliance order, Order No. 7535c, calculating an avoided capacity cost rate of $14.07/MWh that was based on NorthWestern's next planned unit, the preferred 2019 ICE units. MTSUN is entitled to that rate and remand on this issue is not necessary.[26]

## CONCLUSION

¶80 It is indisputable that the PSC's methodologies chosen combined with the reduced contract length had the effect of discouraging development of MTSUN's QF project, which is contrary to PURPA. In reviewing the record and considering each component of the PSC's orders, it is clear that at nearly every step of setting the terms of MTSUN's PPA the PSC chose arbitrary and unlawful methodologies that resulted in deflating the economic feasibility of MTSUN's project.

---

[25] As in *Vote Solar*, the PSC relied on an improper interpretation of the SPP methodology in calculating MTSUN's avoided capacity costs. NorthWestern calculated that MTSUN's project would contribute 0% capacity, but the PSC "imputed" the calculation from the *Vote Solar* docket of 6.1%. Order No. 7535b, ¶ 99. MTSUN had objected to the PSC's interpretation of the SPP methodology during the proceedings but did not raise this issue on appeal to this Court.

[26] While the PSC acknowledges that "[w]ithout question the Commissioners remarks exhibited bias" against solar QF developers, we decline to reach the issue of whether the PSC violated MTSUN's due process rights by making decisions based on bias and policy preferences since we are affirming the District Court on the merits and the PSC has already issued its compliance order in this case.

¶81    For the reasons stated, the District Court did not err in concluding that the PSC's determinations were arbitrary and unlawful. The Court may reverse or modify an agency decision if the substantial rights of a party have been prejudiced because the agency decision violates constitutional or statutory provisions, is made upon unlawful procedure, is affected by other error of law, clearly erroneous in view of the substantial evidence on the whole record, arbitrary or capricious, or characterized by an abuse of discretion. Section 2-4-704(2)(a), MCA. The District Court relied on record evidence in determining the existence of a legally-enforceable agreement and the avoided-cost rates. It did not engage in impermissible rate setting. Accordingly, the District Court's decision is affirmed and MTSUN is entitled to the rates and contract terms set forth in this Opinion.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER

Justice Jim Rice, concurring.

¶82    While the specific legal issues decided here are different than those in *Vote Solar*, there is significant substantive overlap in the respective records of the two cases that require that I join the ultimate outcome reached by the Court here as a matter of *stare decisis*. Important determinations by the PSC in this case were made by incorporating the findings and analyses it had employed in *Vote Solar*. The Court's rejection of the entirety

45

of the PSC's decision in *Vote Solar*—including its factfinding, methodology, analysis and reasoning, and the breadth of the Court's opinion in *Vote Solar*—leave little room for a fresh review of the issues raised here, and none for a different conclusion, despite what I believe to be analytical error in this case.

¶83 Regarding the arguments by the PSC and Northwestern that the Court is without jurisdiction to entertain MTSUN's challenge to the PSC's LEO determination, based upon the argument that the *Whitehall Wind* test violates PURPA, I acknowledge the difficulty courts have encountered in applying PURPA's assignment of matters between state and federal jurisdiction. Opinion, ¶ 55. However, I believe the recent attempt to articulate a bright-line rule by the court in *City of Farmington*, upon which the Court relies, is oversimplistic in light of federal precedent, and incorrect. Opinion, ¶ 57. *City of Farmington*'s framework limits federal jurisdiction under Section 210(h) to the narrow circumstance when a state commission "outright fails to implement a FERC rule," for which FERC, or a private party in absence of FERC action, "may step in and force [the commission] to do so." *City of Farmington*, *22. Then, *City of Farmington* holds that state courts are broadly authorized to entertain all other challenges regarding whether a commission's "actions comply with FERC's requirements under Section 210(g)." *City of Farmington*, *22. While federal jurisdiction is certainly circumscribed under PURPA, I do not believe it is so severely narrowed to apply only to cases where a state commission has "outright fail[ed]" to adopt a FERC rule or requirement.

¶84 As explained in a leading case:

> Cases interpreting the jurisdictional grant in § 210(h) of PURPA have *distinguished between claims challenging the implementation of FERC/state agency regulations and claims challenging the application of such regulations. E.g., Indus. Cogenerators v. FERC*, 310 U.S. App. D.C. 357, 47 F.3d 1231 (D.C. Cir. 1995); *Greensboro Lumber Co. v. Georgia Power Co.*, 643 F. Supp. 1345 (N.D. Ga. 1986), aff'd 844 F.2d 1538 (11th Cir. 1988). As explained in *Greensboro Lumber*, "In general, section 210(h)(2)(B) of PURPA limits federal court jurisdiction to claims that [state agencies] . . . have *failed to comply with their obligation under § 210(f)(2) of PURPA to devise an implementation plan. . . . that is consistent on its face with FERC's regulations.*" *Greensboro Lumber*, 643 F. Supp. at 1374.

*Massachusetts Inst. of Tech. v. Massachusetts Dep't of Pub. Utils.*, 941 F. Supp. 233, 236-37 (D. Mass. 1996) (emphasis added). Thus, federal jurisdiction extends to claims that a state commission's rule or plan facially fails to implement the requirements of FERC. As explained in *Great Divide Wind Farm 2 LLC v. Aguilar*, 405 F. Supp. 3d 1071, 1092 (D.N.M. 2019), "[t]he category of as-implemented challenges *includes more than contentions that a state agency has not acted to implement PURPA and the FERC regulations*; a party may contend in an as-implemented claim *that a state's actions to implement the laws violate* PURPA and the FERC regulations." *Great Divide Wind Farm*, 405 F. Supp. at 1092 (emphasis added). Indeed, the merits of a similar challenge to the one raised here by MTSUN—whether the PSC's *Whitehall Wind* LEO standard violates PURPA—has been ruled upon as an "implementation" challenge in federal court, although

that ruling was reversed on mootness grounds by the Ninth Circuit. *See Bear Gulch Solar, LLC v. Mont. Pub. Serv. Comm'n*, 356 F. Supp. 3d 1041 (D. Mont. 2018).[1]

¶85    In contrast, "matters of application of [a utility's] rules . . . are properly brought before state judicial forums." *Greensboro Lumber*, 643 F. Supp. at 1374 (citation omitted). In *Greensboro Lumber*, plaintiff alleged that it was not provided with "back-up and maintenance power at non-discriminatory, just and reasonable rates." *Greensboro Lumber*, 643 F. Supp. at 1374. The federal district court held it "lack[ed] subject matter jurisdiction over these 'as-applied' claims[,]" citing a FERC ruling that "'complaints regarding an alleged refusal to purchase power from a qualifying facility and the rates for such purchases are matters properly brought in a State forum.'" *Greensboro Lumber*, at 1374 (citing *Snow Mountain Pine Co. v. CP National Corp.*, FERC Docket No. EL84-25-000).

¶86    Under this precedent, I believe the PSC and Northwestern correctly argue that MTSUN's challenge as stated before the District Court was improperly brought in state courts. MTSUN essentially acknowledged that it had failed to satisfy the *Whitehall Wind* LEO test, but asserted that the test "is unlawful in that it does not properly encourage small

---

[1] The Court correctly notes, Opinion, ¶ 55, that the PSC initially argued in *Bear Gulch* that this issue was inappropriately pursued in federal jurisdiction, but the PSC ultimately conceded the point, and the U.S. District Court reached the merits. *See Bear Gulch Solar, LLC v. Mont. Pub. Serv. Comm'n*, 2018 U.S. Dist. LEXIS 94542 (D. Mont.), and *Bear Gulch Solar*, 356 F. Supp. 3d at 1049 ("Plaintiffs allege that [PSC] Order 7500 (and subsequent Orders 7500a-d) are inconsistent with and violate Plaintiffs' rights as QFs under PURPA and FERC's regulations. . . . [T]he [PSC] acknowledged during oral argument that the Court has jurisdiction to decide whether the *Whitehall Wind* standard complies with PURPA."). The PSC has since adopted a new test that substantially revised and expanded the *Whitehall Wind* test, *see* ARM 38.5.1909, and, thus, the Court's order for the PSC to "initiate rulemaking of a new LEO test consistent with this Opinion," Opinion, ¶ 66, is unnecessary, and should be withheld pending review of the revised test.

renewable projects as the Commission is mandated to do under PURPA." The federal precedent strongly suggests this is a challenge to the PSC's implementation plan, subject exclusively to federal jurisdiction. Consequently, I believe the entire section of the Court's opinion following its jurisdictional analysis, under the heading "Lawfulness of the PSC's Whitehall Wind LEO Test" and determining the PSC's *Whitehall Wind* standard "is inconsistent with PURPA and FERC's regulations," Opinion, ¶¶ 58, 66, is in excess of the jurisdiction permitted this Court under PURPA, despite the footnote disclaimer that the ruling "does not purport to limit FERC's jurisdiction over these matters." Opinion, ¶ 57, n.17.

¶87 Consequently, if this were a matter of first impression, I would reject the greater part of MTSUN's challenge as improperly raised in state court and affirm the PSC's determination that a LEO was not established. However, the extent of overlap between this case and *Vote Solar* eliminates any notion of first impression. Under the breadth of the *Vote Solar* decision and the application of *stare decisis*, I am compelled to reach the same ultimate conclusion as the Court, even after disregarding the arguments offered by MTSUN that are beyond our jurisdiction.

¶88 The PSC rejected MTSUN's assertion of a LEO under application of the first prong of the *Whitehall Wind* test, specifically, that the terms offered by MTSUN were not "consistent" with Northwestern's avoided costs, given MTSUN's dramatically higher calculation of avoided capacity. In negotiations, Northwestern's calculations of avoided capacity were about $5/MWh, while MTSUN's were approximately four times as much at about $20/MWh, with calculations becoming increasingly divergent when the parties were

before the PSC. However, the PSC's calculation of avoided capacity here—the central finding of the dispute—has already been overturned and replaced with a calculation by the courts, by the rejection of the capacity methodology employed by the PSC in *Vote Solar*. The Court here holds that "[a]s in *Vote Solar*, the PSC relied on an improper interpretation of the SPP methodology in calculating MTSUN's avoided capacity costs." Opinion, ¶ 78, n.25. While there are aspects of the dispute here that are unique, such as the use of an AERO unit as a proxy resource versus ICE units, they do not alter the greater holding invalidating the methodology as applied by the PSC. Regarding the carbon adder, the PSC based its determination here upon the same findings it had entered in *Vote Solar*, which has been overturned as error. *See* Opinion, ¶¶ 30-31. While I continue to question the carbon adder's vague origins and its propriety in proceedings where consumer indifference is paramount based on the authorities cited in my *Vote Solar* dissent, and believe it remains highly discretionary on the part of the Commission, the issue is settled and the adder imposed by the courts. Regarding contract length, the PSC again relied on evidence it had credited in *Vote Solar*, but which was there rejected by the Court. Opinion, ¶¶ 34-35. Further, in my review, the concessions made in *Vote Solar*'s testimony regarding the viability of the 15-year contract were greater than MTSUN's testimony here, and while I would conclude there was an appropriate basis for the PSC's contract length determination, that issue has already been adversely determined by the Court, and on a record I believe was stronger than here.

¶89 As I expressed in *Vote Solar,* I remained concerned that the courts have imposed rates contrary to proper application of the standards of review, and inappropriately

50

bolstered staff recommendations. Nonetheless, as a result of the above holdings, and upon application of *stare decisis*, the PSC's determination to alter the terms of the proposed PPA, and to conclude the PPA offered by MTSUN was not "consistent" with Northwestern's avoided costs under the first prong of the *Whitehall Wind* test, cannot be supported even upon an inquiry properly conducted by state courts under PURPA. For the reasons I set forth in *Vote Solar*, I believe the unfortunate consequence of this decision will likewise be to significantly increase the costs for provision of power that will ultimately become the burden of ratepayers, in excess of, and therefore in violation of, the intention of Congress under PURPA.

¶90    I concur.

/S/ JIM RICE

Justice Laurie McKinnon joins in the concurring Opinion of Justice Rice.

/S/ LAURIE McKINNON